**SOCIETY CREATED TO REDUCE URBAN BLIGHT (SCRUB), Mary Cawley Tracy, Wynnefield Heights Civic Association, Belmont Village Community Association, and George David, Jr.**

v.

**ZONING BOARD OF ADJUSTMENT OF the CITY OF PHILDELPHIA, The City of Philadelphia and Patrick B. Gillespie, Jr./Shannon Outdoor, LLC**

Appeal of: Society Created to Reduce Urban Blight (SCRUB), Mary Cawley Tracy, Wynnefield Heights Civic Association and Belmont Village Community Association.

**Society Created to Reduce Urban Blight (SCRUB), Mary Cawley Tracy, Wynnefield Heights Civic Association, Belmont Village Community Association, and George David, Jr.**

v.

**Zoning Board of Adjustment of the City of Phildelphia, The City of Philadelphia and Patrick B. Gillespie, Jr./Shannon Outdoor, LLC**

Appeal of: Patrick B. Gillespie, Jr. and Shannon Outdoor, LLC.

Commonwealth Court of Pennsylvania.

Argued March 5, 2007.
Decided April 4, 2007.
Reargument, Reconsideration and Rehearing En Banc Denied May 25, 2007.

---

Samuel C. Stretton, West Chester, for designated appellant, SCRUB.

Steven E. Pachman and Lathrop B. Nelson, III, Philadelphia, for appellees, Patrick B. Gillespie, Jr. and Shannon Outdoor, LLC.

BEFORE: LEADBETTER, President Judge, and SIMPSON, Judge, and McCLOSKEY, Senior Judge.

OPINION BY Senior Judge McCLOSKEY.

This case involves the cross-appeals of the Society Created to Reduce Urban Blight (SCRUB), Mary Cawley Tracy, Wynnefield Heights Civic Association, Belmont Village Community Association (hereafter collectively referred to as SCRUB) and Patrick B. Gillespie, Jr. and Shannon Outdoor, LLC (hereafter collectively referred to as Shannon Outdoor) from an order of the Court of Common Pleas of Philadelphia County (trial court), reversing a decision of the Zoning Board of Adjustment of the City of Philadelphia (Board), which granted a variance to Shannon Outdoor with respect to a billboard sign.[1] In reaching its decision, the trial court concluded that SCRUB lacked standing to appeal the decision of the Board on the basis of Section 17.1 of the First Class City Home Rule Act (Act)[2] but that George David, Jr., a neighboring landowner, did have standing as a potential "aggrieved person."

The sign in question is located on Lot C of the Washington House Apartment Building complex at 3800 City Line Avenue. This property is owned by a third party and is directly adjacent to the Schuylkill Expressway. The property had previously included an accessory sign that was twelve feet by twenty-four feet, double-sided and illuminated. By 2001, this accessory sign had fallen into a state of disrepair. At that time, Shannon Outdoor entered into a forty-year lease with the property owner. As part of the lease agreement, Shannon Outdoor cleaned the site around the original sign, removed the structure for that sign and replaced the same with a single pole billboard structure. This new structure accommodated a sign fourteen feet by forty-eight feet, double-sided and illuminated. This new sign was a non-accessory sign. Shannon Outdoor,

---

1. Although not entirely clear from the evidence of record, it appears that Mr. Gillespie maintained an ownership interest in Shannon Outdoor, LLC.

2. Act of April 21, 1949, P.L. 665, *as amended*, added by Section 2 of the Act of November 30, 2004, P.L. 1523, 53 P.S. § 13131.1.

however, never obtained a building permit for the single pole structure.

On October 2, 2002, Shannon Outdoor applied for a zoning and/or use registration permit from the City of Philadelphia, Department of Licenses and Inspections (L & I) for this new non-accessory sign. On November 25, 2002, L & I issued a notice of refusal of permit as a result of the sign's non-compliance with certain provisions of the Philadelphia Zoning Code (the Code). Specifically, the notice of refusal provided the following reasons for refusal: (1) the bottom edge of the sign was thirty-six feet above the road surface; (2) no sign of equal or greater value has been or was to be removed as credit for this sign; (3) the sign was existing within 300 feet of a residentially zoned property; (4) the sign was existing within 660 feet of an ingress/egress ramp of the Schuylkill Expressway; and (5) the sign was existing within 660 feet of the outward edge of any park under the jurisdiction of the Fairmount Park Commission, the Commonwealth or the National Park Service.

Shannon Outdoor thereafter filed an appeal with the Board requesting a variance, use permit/certificate and/or a special use permit such that was necessary to maintain the existing sign. The Board eventually conducted a public hearing on September 28, 2005. At the outset of the hearing, counsel for Shannon Outdoor requested that the Board limit testimony to only those "aggrieved persons" who had a direct interest in and could be detrimentally harmed by the Board's determination. The Board, however, indicated that it was permitting any taxpayer in Philadelphia to speak in the matter. The case then proceeded with testimony.

Mr. Gillespie testified on behalf of Shannon Outdoor, noting the extensive work it undertook removing the previous sign structure, including the removal of protruding electrical wires, cleaning up the area around that sign and building the single pole structure. Mr. Gillespie indicated that the owner of the property had advised him that he would handle any issues concerning necessary building permits and Mr. Gillespie himself would later seek a non-accessory sign permit. Mr. Gillespie proceeded to offer his opinion that the new sign would not adversely affect any public interest, noting that there are only commercial and large apartment buildings in the vicinity and there are other large signs abutting the Schuylkill Expressway.

On cross-examination, Mr. Gillespie acknowledged that he did not seek a permit for the erection of a non-accessory sign, that he received income from the use of the sign and that he was unaware that the sign violated any provision of the Code until L & I served him with a notice of violation.[3] Mr. Gillespie also conceded that, while he has been in the business as a broker for nine years, he had not initiated any studies of traffic patterns in the area and had not had discussions with any local civic associations. On re-direct examination, Mr. Gillespie indicated that he engaged professionals to install the single pole structure and the accompanying electrical wiring, that he has a maintenance crew which does periodic inspections and repairs and that, as a broker, he does not get involved in permits or approvals.

SCRUB thereafter presented testimony from several individuals, including Mr. David. Mr. David was part owner of LAD Presidential, III, which owns the adjacent

---

**3.** Subsequent to this notice of violation, Shannon Outdoor filed its request for a zoning and/or use registration permit with L & I.

Monroe Office Building, approximately 1,000 feet from the sign.[4] Mr. David noted that there were residential properties and apartment buildings in the area. Mr. David strenuously objected to the sign, noting that it detracted from the area and that it abutted Fairmount Park. Next, SCRUB presented the testimony of Michael McClary, a member of the board of the Wynnefield Heights Civic Association. Mr. McClary verified a letter from the Association opposing the sign. Mr. McClary noted that the Association represented the people and the community that encompasses the area where the sign is located. Mr. McClary stated that the sign clutters the landscape, detracts from the neighborhood and that it abuts both Fairmount Park and the Schuylkill Expressway. On cross-examination, Mr. McClary acknowledged that neither he nor any other members of the Association reside at the apartment complex next to the sign.

Next, SCRUB presented the testimony of Orlando Montanez, president of the Belmont Village Community Association. Mr. Montanez noted that his association is adjacent to Wynnefield Heights, approximately a mile to a mile and a half from the sign. Mr. Montanez noted his Association's opposition to the sign, noting that it detracts from new businesses and new residents and that it distracts drivers on the Schuylkill Expressway. On cross-examination, Mr. Montanez conceded that none of its members reside at the apartment complex next to the sign. In fact, Mr. Montanez noted that his Association does not include the area in which the sign is located.

SCRUB's last witness was Mary Tracy, its executive director. Ms. Tracy indicated that her organization represents people who live in the vicinity of the sign and indirectly represents residents of the apartment complex next to the sign. Ms. Tracy noted that several students lived at the complex and were "somewhat members of SCRUB." (R.R. at 203a). Ms. Tracy discussed SCRUB's effort to change the law to better control the proliferation of billboards and outdoor advertising within the city of Philadelphia. Ms. Tracy then noted that the sign violates federal laws due to its proximity to the Schuylkill Expressway and that it violates an agreement between the city and the Commonwealth. Counsel for SCRUB presented into evidence, without objection, photographs of the sign taken by Ms. Tracy. Ms. Tracy then noted that many of the residents of the apartment complex have no view other than the sign and that the sign creates a deteriorating aesthetic view of the entire property. On cross-examination, Ms. Tracy acknowledged that SCRUB is controlled by a board of directors, including herself, none of whom reside in the apartment complex next to the sign.

Finally, the Board heard testimony from Paula Brumbelow of the City Planning Commission. Ms. Brumbelow indicated the strong recommendation of the Commission that the request for variances be denied. As to the reasons underlying this recommendation, Ms. Brumbelow noted that the application was not a minor departure from the Code, implicating at least six different provisions. Ms. Brumbelow reiterated the reasons set forth by L & I in denying the permit. Additionally, Ms. Brumbelow indicated that the granting of the variances would undermine efforts by

4. Interestingly, Mr. David's family had previously owned the property upon which the sign is situated and had maintained the original accessory sign. This original sign was simply a property identification sign listing the features of the residential apartments available for lease.

City Council to cap the number of existing signs in the city and to improve the appearance of the recognized gateways to the city. Further, Ms. Brumbelow indicated a lack of hardship unique to this property, noting that the site was not unique or unusual and that the disapproval of the application would have no impact on the ability of the site to accommodate permitted uses in an R–15 residential district zoning classification.

Following the hearing, the Board issued a decision granting Shannon Outdoor's request for a use variance. In rendering its decision, the Board concluded that Shannon Outdoor had met its burden of proving, *inter alia*, that an unnecessary hardship will result if the variance was not granted that was unique to the property and that the proposed use was not contrary to the public interest. More specifically, the Board noted that Mr. Gillespie had relied upon the representation of the owner of the property that he would obtain the necessary permits, that Mr. Gillespie had hired professionals to install the new sign structure and improve the site and that if the variance were not granted, Shannon Outdoor would be required to remove the sign and would suffer a substantial economic loss. As to the public interest, the Board noted that Shannon Outdoor had cleaned up the site. In addition, the Board noted that there was no direct evidence presented by persons living at the apartment complex next to the sign as to any interference with their use or enjoyment of the property. Further, the Board noted a lack of evidence of interference with traffic patterns or obscuring of vision of drivers on the nearby Schuylkill Expressway.

SCRUB and Mr. David thereafter filed an appeal with the trial court. The trial court did not take additional evidence. The parties filed their respective briefs with the trial court. In its brief, Shannon Outdoor alleged that SCRUB and Mr. David lacked standing to appeal the Board decision based upon the General Assembly's enactment of Section 17.1 of the Act and the fact that none of the appellants would be detrimentally harmed by the grant of the variance. The trial court proceeded to conduct oral argument solely on the issue of standing.

Following oral argument, on July 13, 2006, the trial court issued an opinion and order reversing the decision of the Board as to the grant of the variance, concluding that SCRUB lacked standing under Section 17.1 of the Act and concluding that Mr. David did have standing as a potentially "aggrieved person" and neighboring landowner. With respect to the merits, the trial court concluded that the Board abused its discretion in finding that Shannon Outdoor had met its burden of proof to warrant the grant of a variance for a sign that is in "blatant violation of the [Code]." (Opinion of Trial Court at 6). The trial court also concluded that the record is devoid of any evidence to even remotely justify the Board's conclusions regarding unnecessary hardship and public interest. The trial court noted that economic loss fails to meet the standard of a legal hardship and that a zoned use which is less financially rewarding than a proposed use is insufficient to justify a variance. As to public interest, the trial court noted the testimony of Mr. David regarding the sign's interference with the aesthetics of the area.

On July 24, 2006, Shannon Outdoor filed a motion for reconsideration with the trial court. In this motion, Shannon Outdoor indicated that Mr. David had executed an agreement of purchase and sale on March 13, 2006, with respect to his interest in the Monroe Office Building, i.e., the property adjacent to the sign. The parties to the

sale included LAD Presidential, III, of which Mr. David was part owner, and BLDG Acquisition Corp. An affiliated entity of BLDG Acquisition Corp. owned the property where the apartment complex and sign were located. At the time of oral argument, Shannon Outdoor indicated that Mr. David had already transferred his equitable interest in the Monroe Office Building and that the agreement of sale included a provision whereby Mr. David agreed to withdraw his appeal before the trial court. As Mr. David had transferred his equitable interest, Shannon Outdoor alleged that he no longer had standing to appeal the Board's decision and assert that he would be detrimentally harmed. However, by order dated July 25, 2006, the trial court denied Shannon Outdoor's motion. Both SCRUB and Shannon Outdoor filed notices of appeal with the trial court.

By order dated November 22, 2006, we granted permission to Shannon Outdoor to supplement the record to include an affidavit from Scott Zecher, an authorized agent of BLDG Monroe, L.P. In this affidavit, Mr. Zecher indicated that the agreement to purchase and sale was executed by Mr. David and BLDG Acquisition Corp. on March 14, 2006, and that the latter subsequently assigned its rights under the agreement to BLDG Monroe, L.P., an affiliated entity. Mr. Zecher noted that an affiliated entity of BLDG Monroe, L.P. owned the property which included the

apartment complex and sign. Mr. Zecher also noted that the agreement contained a provision whereby Mr. David agreed to withdraw his appeal before the trial court upon closing, which occurred on July 25, 2006. Mr. Zecher attached a copy of a release signed by Mr. David on July 24, 2006, releasing BLDG Philadelphia, the affiliated entity of BLDG Monroe, L.P., from all claims, actions or causes of action regarding the new sign. Finally, Mr. Zecher noted that BLDG Monroe, L.P. did not object to the variance and did not intend to become a party to the present action.

■■■ On appeal,[5] SCRUB argues that the trial court erred as a matter of law in concluding that it lacked standing pursuant to Section 17.1 of the Act.[6] We disagree.

Section 14–1807(1) of the Code provides the right of appeal to "[a]ny person ... aggrieved by any decision of the Board, or any taxpayer...." This general taxpayer standing was confirmed by this Court's previous decision in *Procacci*. In *Procacci*, we noted that Section 14–1807(1) of the Code, by extending standing to any taxpayer, provided "a rather broad standard to be considered a party with standing to participate in proceedings before the Board or to have standing to appeal an adverse decision to the trial court." *Procacci*, 729A.2d at 121.[7] We also noted that

---

**5.** Our scope of review in a zoning case where the trial court takes no additional evidence is limited to determining whether the Board committed an abuse of discretion or an error of law. *SPC Company, Inc. v. Zoning Board of Adjustment of the City of Philadelphia*, 773 A.2d 209 (Pa.Cmwlth.2001), *petition for allowance of appeal denied*, 568 Pa. 689, 796 A.2d 320 (2002). An abuse of discretion is found where the Board's findings are not supported by substantial evidence. *Id.* Moreover, a decision to grant or deny a motion to quash an appeal is a question of law within this Court's scope of review. *Society Created*

*to Reduce Urban Blight (SCRUB) v. Zoning Board of Adjustment of the City of Philadelphia (Procacci)*, 729 A.2d 117 (Pa.Cmwlth. 1999), *petition for allowance of appeal denied*, 574 Pa. 778, 833 A.2d 146 (2001).

**6.** The City, an appellee in this matter, filed a brief essentially agreeing with SCRUB's arguments as to this issue.

**7.** Philadelphia is a "Home Rule" city and is the only first-class city in the Commonwealth. It conducts its affairs in accordance with the Philadelphia Home Rule Charter, 351 Pa.

the General Assembly had excluded Philadelphia from the provisions of the Pennsylvania Municipalities Planning Code (MPC), including Section 908(3), which limits standing to persons aggrieved by the decision of a zoning hearing board.[8]

Section 17.1 of the Act, which the trial court relied upon in concluding that SCRUB lacked standing, provides as follows:

> In addition to any aggrieved person, the governing body vested with legislative powers under any charter adopted pursuant to this act shall have standing to appeal any decision of a zoning hearing board or other board or commission created to regulate development within the city. As used in this section, the term 'aggrieved person' does not include taxpayers of the city that are not detrimentally harmed by the decision of the zoning hearing board or other board or commission created to regulate development.

SCRUB concedes that while there may be constitutional issues with respect to Section 17.1 of the Act and its passage, these issues were not preserved in this appeal. Rather, SCRUB notes that the present matter simply involves the issue of statutory interpretation and construction. As to this interpretation and construction, SCRUB argues that Section 14–1807(1) of the Code created two categories of individuals with the right to appeal a decision of the Board, any person aggrieved by that decision and any taxpayer in general. We agree with SCRUB's analysis in this regard. However, SCRUB proceeds to argue that Section 17.1 of the Act was only meant to apply to the first category of individuals and did not apply in any man-

ner to the second category, i.e., general taxpayers. We cannot agree with SCRUB's interpretation in this regard.

To the contrary, we see no purpose of the language of Section 17.1 of the Act other than to limit the broad grant of general taxpayer standing provided in Section 14–1807(1) of the Code. Admittedly, Section 17.1 expanded the authority of the governing body of a municipality to appeal a decision from a zoning hearing board or any other board or commission which seeks to regulate development. In addition to the governing body, Section 17.1 noted the ability of an "aggrieved person" to appeal such decisions. However, the General Assembly specifically limited the definition of an "aggrieved person" by excluding taxpayers of the city who are not "detrimentally harmed." In other words, we agree with the trial court that said language effectively eliminated the grant of general taxpayer standing provided in Section 14–1807(1) of the Code. Under Section 17.1, only a taxpayer with an interest that could be "detrimentally" affected by a decision of an entity such as the Board has standing to appeal. Thus, we cannot say that the trial court erred as a matter of law in concluding that SCRUB lacked standing pursuant to Section 17.1 of the Act.

■ Next, Shannon Outdoor argues that the trial court erred as a matter of law in concluding that Mr. David had standing. We disagree.

Shannon Outdoor's argument in this regard is premised exclusively on the fact that LAD Presidential, III, of which Mr. David was part owner, had executed an agreement of purchase and sale of its

---

Code §§ 1.1–100–12.12–503, adopted pursuant to the General Assembly's enactment of the Act, 53 P.S. §§ 13101–13157.

**8.** Act of July 31, 1968, P.L. 805, *as amended,* 53 P.S. § 10908(3).

neighboring property on March 13, 2006.[9] The closing of this sale occurred on July 25, 2006. However, we fail to see how execution of this agreement of sale and subsequently closing deprived Mr. David of standing. Shannon Outdoor commenced the present matter with the filing of an application for a zoning and/or use registration permit in October of 2002. Following denial of this application on November 25, 2002, Shannon Outdoor filed an appeal with the Board. The Board conducted a hearing on September 28, 2005, which included testimony from Mr. David.

Following the Board's grant of a variance to Shannon Outdoor, SCRUB and Mr. David filed an appeal with the trial court. The trial court heard oral argument with respect to this appeal on July 12, 2006, and issued an opinion and order reversing the Board the next day. Although by this time Mr. David, on behalf of LAD Presidential, III, had executed the agreement of purchase and sale, LAD Presidential, III, still maintained its ownership of the neighboring property. Likewise, Mr. David, as part owner of LAD Presidential, III, remained a neighboring landowner with a direct interest in the matter. The closing of this sale did not occur until July 25, 2006, approximately two weeks subsequent to the trial court's opinion and order.[10]

■■■ Alternatively, Shannon Outdoor contends that even without consideration of the agreement of purchase and sale, Mr. David still lacked standing as he was not "aggrieved" or "detrimentally harmed" by

the decision of the Board. Again, we disagree. Traditionally, a party is aggrieved when he "is adversely, directly, immediately and substantially affected by a decision." *Sparacino v. Zoning Board of Adjustment, City of Philadelphia*, 728 A.2d 445, 448 (Pa.Cmwlth.1999), *petition for allowance of appeal denied*, 565 Pa. 680, 775 A.2d 811 (2001).[11] In *Sparacino*, we further noted that it was "well established that an adjoining property owner, who testified at the hearing before the zoning board in opposition to the zoning application, has sufficient interest in the adjudication and therefore has standing to appeal the Board's decision to the trial court." *Id.*

In the present case, as noted above, Mr. David was part owner of LAD Presidential, III, a company which owned the property directly adjacent to the subject property upon which the billboard was erected. Mr. David objected to Shannon Outdoor's request for a variance and testified in this regard before the Board. During this testimony, Mr. David "strenuously" objected to the billboard, noting that the billboard is visible from his property and detracts from the area, including the area of Fairmount Park which abuts the subject property. (R.R. at 187a). Based upon this testimony and his ownership interest in the neighboring property, we believe that Mr. David satisfies the traditional standards of an aggrieved party. Thus, we cannot say that the trial court erred as a matter of law in concluding that Mr. David had standing.

**9.** As noted above, pursuant to the agreement for sale, the property was to be sold to BLDG Acquisition Corp., an affiliated entity of which owned the subject property upon which the billboard was erected.

**10.** One could argue that Mr. David lost his standing upon this closing. However, such an argument is not applicable to the present

case as the closing here occurred subsequent to the conclusion of the litigation below.

**11.** We do not believe that the General Assembly's use of the phrase "detrimentally harmed" in Section 17.1 of the Act added to or detracted from the traditional notion requiring an aggrieved party to be "adversely affected."

■ Finally, Shannon Outdoor argues that the trial court erred as a matter of law in concluding that the Board abused its discretion in granting the variance. We disagree.

■ Generally, in order to obtain a variance, a landowner bears the heavy burden of proving that he suffers from an unnecessary hardship, which hardship is unique or peculiar to the property and not self-imposed, and that granting the variance will not adversely affect the public heath, safety, and welfare. *Valley View Civic Association v. Zoning Board of Adjustment,* 501 Pa. 550, 462 A.2d 637 (1983); *Bruni v. Zoning Hearing Board of Plymouth Township,* 52 Pa.Cmwlth. 526, 416 A.2d 111 (1980). These requirements are also found in Section 14–1802 of the Code.[12] Nevertheless, the law is well settled that a variance will not be granted solely because the applicant will suffer an economic hardship if he does not receive the same. *See Sotereanos v. Zoning Board of Adjustment of the City of Pittsburgh,* 711 A.2d 549 (Pa.Cmwlth.), *petition for allowance of appeal denied,* 556 Pa. 699, 727 A.2d 1125 (1998).

Before the Board, Shannon Outdoor presented the testimony of Patrick B. Gillespie in order to meet its burden with respect to the issue of unnecessary hardship.[13] Mr. Gillespie indicated that he was merely a sign broker for nine years and that he was never involved in the construction of a sign prior to the one presently at issue. Mr. Gillespie noted that he was initially contacted by the owner of the subject property to evaluate at an existing sign in April of 2001. Subsequent to this evaluation, at the request of the property owner, Mr. Gillespie engaged contractors to remove the existing sign and sign structure and replace the same with the present monopole sign. At the same time, Shannon Outdoor entered into a forty-year lease with the property owner. The construction of the present sign was completed in June of 2001.

Mr. Gillespie acknowledged that the prior sign was a permitted accessory sign. Mr. Gillespie further acknowledged that he did not have a building permit for the present sign, noting that he relied upon the representation of the property owner that he would take care of all permit issues. Mr. Gillespie indicated that the removal of the existing sign included extensive clean up of the surrounding area. On cross-examination, Mr. Gillespie conceded that he did not seek a permit for the present sign until October of 2002, even though he testified that he was aware that a non-accessory sign was prohibited in that area since 1991. Mr. Gillespie also indicated that subsequent to construction of the present sign, he became aware that the same was within 660 feet of Fairmount Park. As to the issue of public health, safety and welfare, the Board concluded that Shannon Outdoor had met its burden in this regard, citing to the significant deterioration of the existing sign and the subsequent clean up of the site. The Board also cited to a lack of evidence that the sign interferes with traffic or obscures the vision of drivers on the adjacent Schuylkill Expressway. However, this latter finding by the Board seems to ignore the fact that Mr. Gillespie, as the applicant for the variance, conceded that he did not engage in any traffic pattern studies in the area of the sign. Moreover, the Board's findings seem to ignore the public policy

---

**12.** This Section mandates that the Board consider each of the requirements for a variance contained therein.

**13.** As noted above, it appears that Mr. Gillespie is the owner or has an ownership interest in Shannon Outdoor, LLC.

against such billboards as enunciated by the City of Philadelphia in Section 14–1604 of the Code.[14] Further, Mr. David testified as to sign's interference with aesthetics of the area. Based upon the evidence of record or, for that matter, the lack thereof, we cannot say that the trial court erred as a matter of law in concluding that the Board abused its discretion in granting the variance.

Accordingly, the order of the trial court is affirmed.

President Judge LEADBETTER concurs in the result only.

### ORDER

AND NOW, this 4th day of April, 2007, the order of the Court of Common Pleas of Philadelphia County is hereby affirmed.

---

**14.** Section 14–1604 of the Code notes the "City-wide proliferation of commercial outdoor advertising signs" which "contribute to visual clutter and detract from the [City's] aesthetic beauty," "negatively impact upon the economic viability" of commercial and industrial areas and "jeopardize public safety by distracting pedestrians and to a greater extent passing motorists...." Sections 14–1604(1)(a), (b), (f) and (g).